FILED
2022 Mar-30  PM 03:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

| | | |
|---|---|---|
| **ROSLYN PERRYMAN, and** | ) | |
| | ) | |
| **STEPHEN PERRYMAN,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:22-cv-00123-MHH** |
| | ) | |
| **HOTEL WETUMPKA AL, LLC (dba, HAMPTON INN, WETUMPKA), and,** | ) ) ) | |
| | ) | |
| **HILTON DOMESTIC OPERATING COMPANY, INC.,** | ) ) | |
| | ) | |
| **HILTON FRANCHISE HOLDING COMPANY, LLC,** | ) ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

COME NOW Plaintiffs Roslyn Perryman and Stephen Perryman ("Plaintiffs" or "the Perrymans"), a married couple, by and through undersigned counsel and file and serve this First Amended Complaint as a matter of course. This Amended Complaint replaces, supersedes, the original Complaint.

Plaintiffs' action is against original Defendants Hotel Wetumpka AL, LLC, dba Hampton Inn and/or Hampton Inn by Hilton, ("Hampton by Hilton"); Hilton Domestic Operating Co., Inc. ("Hilton"); and, by and through this Amended Complaint, Hilton's subsidiary, Hilton Franchise Holding Company, LLC (collectively, "Defendants"). Plaintiffs state as follows:

1

## REGARDING THIS AMENDED COMPLAINT

A.  Rule 15(a)(1)(B) of the Fed. R. Civ. P. allows for a Complaint to be amended as a matter of course within 21 days of the date the responsive pleading was filed

B. This Amended Complaint is filed and served within twenty-one (21) days  of Hilton's responsive filing to the original Complaint (its Motion to Dismiss filed on March 10, 2022) and within twenty-one (21) days of Hampton by Hilton's Answer being filed on March 16, 2022.

C. This Amended Complaint replaces and supersedes the original Complaint. However, Plaintiffs have left the original Complaint Introduction and Paragraphs 1-98 intact, with updates set out in Paras. 144-153 below.

D. Paragraphs 99-104 below re-plead the Parties to this action (adding Hilton Franchise Holding Company, LLC, as a Defendant).

E. Paragraphs 105-153 below make additional allegations and update original Complaint allegations (in the latter case principally regarding Hilton's and Hilton Franchise Holding Company, LLC's relationship with one another).

F. Counts I-III of the original Complaint remain untouched, although their constituent paragraphs have been renumbered (now Paras. 154-190).

G. Plaintiffs add Count IV below (Paras. 191-199) and request additional relief as regards all Defendants.

## INTRODUCTION

This is a race discrimination case in public accommodations under Title II of the Civil Rights Act of 1964 and in the right to contract under 42 U.S.C. § 1981. Plaintiffs bring this action seeking redress against and accountability arising from Defendants' joint and several acts of race discrimination. Plaintiffs also allege the tort of outrage.

## JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. § 1331 and § 1343(a)(4). The Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b), because Defendant Hilton resides and does business in the Southern Division of the Northern District of Alabama and because a substantial part of the claim occurred within in the Southern Division of the Northern District of Alabama, where both Plaintiffs reside.

## PARTIES and GENERAL BACKGROUND

3. Plaintiff Roslyn Perryman is a Black woman. She is employed by a contract administrator for various HUD-based apartments in the Birmingham, Alabama, area.

4. Plaintiff Stephen Perryman is a Black man. He is employed by a pharmaceuticals manufacturer which produces various medicines.

5. Plaintiffs are married and, with their son and daughter, reside in Jefferson County, Alabama.

6. Defendant Hampton by Hilton's is a limited liability company whose name is registered with the Alabama Secretary of State's Office as "Hotel Wetumpka AL, LLC," whose organizer resides in Montgomery County, Alabama, and whose primary place of business is located in Wetumpka, Elmore County, Alabama.

7. Upon understanding and belief Defendant Hampton by Hilton is a Hilton Domestic Operating Company, Inc., franchise.

8. Defendant Hilton Domestic Operating Company, Inc., is a corporation incorporated under the laws of the State of Delaware that maintains its principal office in the Commonwealth of Virginia. Hilton is engaged in the overall operation, management, policy-making, oversight and franchising of various hotels and hotel brands, including the Hampton by Hilton line of franchises, which includes Defendant Hampton by Hilton in Wetumpka, Alabama.

9. At all times relevant to the facts set forth in this Complaint, Defendant Hilton regularly conducted business in the State of Alabama.

10. Upon information and belief, the Defendant Hampton by Hilton is Defendant Hilton's franchise.

11. Both Defendants own and/or operate and/or oversee and/or make policies for and/or derive income from the operations of the Hampton by Hilton hotel in Wetumpka, Alabama.

12. The Hampton by Hilton in Wetumpka offers accommodations to the public.

13. At all times relevant to this Complaint, Defendant Hampton by Hilton employed a white woman whose name is currently unknown as a front desk night manager ("Night Manager"). At all times relevant hereto, this Night Manager was an agent, representative and employee of Hampton by Hilton.

14. At all times relevant to this Complaint, Defendant Hampton by Hilton employed Samantha Hall ("Ms. Hall") as its General Manager. At all times relevant hereto, Ms. Hall was an agent, representative and employee of Hampton by Hilton.

15. At all times relevant to this Complaint, both the Night Manager and Ms. Hall acted within the line, course and scope of their employment with Defendant Hampton by Hilton.

16. Defendant Hilton follows general hotel chain and franchise industry standards regarding its relationship with its franchisess ("Industry Standards"), including its Wetumpka, Alabama, franchise, Defendant Hampton by Hilton.

17. Industry Standards include, but are not limited to, hotel franchisors providing their respective franchisees with hotel owner's operations guidance; policies; training standards and manuals; and, at the franchisor's option, certain hiring, supervision and training policies and practices; as well as other overall hotel and brand guidance, software, training-related and other materials for operations of the franchisee hotel.

18. While Defendant Hampton by Hilton may conduct day-to-day operations of the Wetumpka Hampton Inn, it looks to and relies upon its franchisor, Defendant Hilton

(as well as any Hilton parent and/or affiliated companies), for its overall and overarching operations guidance, standards and practices.

19. At all times relevant hereto, both Defendants maintained a policy, practice or custom of allowing their front desk managers an amount of discretion to racially profile Hampton by Hilton would-be guests, that is, invitees, present in the Hampton by Hilton lobby and, if such front desk managers – such as the Night Manager in the present action – were disinclined to accommodate Black guests and other invitees, tell such Black guests that the Hampton by Hilton's got "no rooms for *you*," or even allow such guests and other invitees to use the lobby restrooms.

20. Accordingly, such policy, practice or custom of Defendants Hilton and/or Hampton by Hilton, put into practice by the Night Manager as described herein, make Defendants are directly liable for their violations of Title II of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, and Alabama tort violations set forth herein.

21. To the extent either or both Defendants are not directly liable for the Federal Law-violative and tortious acts and omissions of the Night Manager, they are vicariously liable under a theory of *respondeat superior*.

22. In connection with Plaintiffs and the circumstances described herein, the Night Manager, Ms. Hall, and Defendant Hampton by Hilton all acted as the actual or apparent agent/s of Defendant Hilton. Plaintiffs believed and understood they were doing business with both Hampton by Hilton and the owner of the brand name "Hilton," which

is Defendant Hilton. The Wetumpka hotel's front sign reads: "Hampton by Hilton."

23. Defendants offer public accommodations at a Hampton by Hilton hotel in Wetumpka, Alabama, as the Hampton Inn and/or Hampton by Hilton located at 350 S Main Street Wetumpka Alabama 36092.

24. On October 11, 2021, Defendants – by and through their agent and representative – refused Plaintiffs the use and enjoyment of the benefits, privileges, terms and conditions that they extend to all other similarly situated guests and other invitees. Defendants breached their contract and covenant of good faith and fair dealing with Plaintiffs because of their race, Black, discriminating against them in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981; 42 U.S.C. § 2000(a) (Title II of the Civil Rights Act of 1964); and perpetrated intentional infliction of emotional distress (also known as the tort of outrage) against Plaintiffs.

## STATEMENT OF FACTS

25. For several days prior to October 11, 2021, incident date, Plaintiffs, the Perrymans, their 15-year-old daughter, and 11-year-old son, had been visiting relatives in Atlanta, Georgia.

26. Plaintiffs decided not to return directly from Atlanta to Birmingham, but, instead, first travel to Wetumpka, Alabama, where Ms. Perryman had family, so they could visit with them, then return to Birmingham.

27. Plaintiffs left Atlanta late in the evening and drove through the night, into the

early morning, hoping to stay at a hotel in Wetumpka, grab a few hours sleep, then visit with family on October 11, then on October 12, 2021. Mr. Perryman was driving.

28. Not too long outside of Wetumpka, around 2:30-2:45 a.m. on the morning of October 11, 2021, Ms. Perryman looked-up and called Hilton's / Hampton Inn's customer service line to confirm that the Wetumpka Hampton by Hilton had rooms available and that her family could get a room that night / early morning.

29. The Hilton / Hampton Inn customer service representative confirmed that rooms were available at the Wetumpka Hampton by Hilton that there should be no issue with getting a room for the Perrymans and their two children.

30. Mr. Perryman drove on to the Wetumpka Hampton by Hilton, parked in front of the lobby, and stayed in the Perryman's car with their children while Ms. Perryman went inside to secure a room.

31. As the Perrymans had been on the road for more than two (2) hours, and as it was about 3:00 a.m. in the morning of October 11, 2021, they were looking forward to securing a room, using its restroom, winding down and getting some sleep.

32. When Ms. Perryman entered the Hampton by Hilton lobby she saw only one person, the Night Manager, at the front desk. Ms. Perryman approached as said, "Good evening. How are you?" or words of greeting to that effect.

33. The Night Manager looked Ms. Perryman up and down. If the Night Manager said anything, Ms. Perryman did not hear it. Ms. Perryman saw only a look of hostility,

disgust and judgment on the Night Manager's face. The Night Manager just stared at Ms. Perryman.

34. Both objectively and subjectively, it was apparent that the white Night Manager did not like Ms. Perryman, a Black woman, walking up to the Hampton by Hilton's front desk at night.

35. Ms. Perryman continued on, though, starting to tell the Night Manager know that the Perrymans would like to secure a room until Wednesday, October 13, but before Ms. Perryman could complete her sentence the Night Manager cut her off, telling Ms. Perryman the hotel had no rooms "for *you*."

36. The Night Manager made it clear to Ms. Perryman that it was not a matter of having no vacancies at the Hampton by Hilton, but, rather, that there were no rooms available for Ms. Perryman and her family, who were Black.

37. Ms. Perryman was stunned. The Night Manager just stood there, matter of factly.

38. Ms. Perryman asked if she could at least use the women's room, the restroom, off the lobby. The Night Manager said the restroom was out of order. The restroom was not out of order.

39. Defeated, demoralized, and still needing a restroom, Ms. Perryman left the lobby and returned to the family car.

40. In short order Ms. Perryman told Mr. Perryman what had happened. She then

suggested Mr. Perryman go inside and ask the Night Manager if *he* could at least use the men's restroom (and, if so, pave the way for the Perryman's children to use the restroom).

41. Mr. Perryman left the family car, walked into the lobby and ask the Night Manager if he could use the restroom. The Night Manager refused to let Mr. Perryman use the restroom. Mr. Perryman was not dressed as a vagabond, but he was Black.

42. Mr. Perryman left the Hampton by Hilton lobby and returned to the Perryman's vehicle.

43. The Perrymans, feeling devastated, just decided to drive back up to Birmingham and forego seeing their Wetumpka relatives.

44. As the Night Manager, besides not allowing this Black family to secure a hotel room, had also refused to let them use the lobby restrooms, the Perryman's soon found and pulled into "Patriot Fueling Center" in Wetumpka and the family used that gas station's restrooms.

45. The Perrymans arrived at their home in Birmingham, Alabama, around 4:30 or 5:00 a.m., exhausted and demoralized.

46. On the afternoon of October 11, from her home in Birmingham, Ms. Perryman telephoned the Wetumpka Hampton by Hilton and spoke with General Manager Samatha Hall about what had occurred earlier that day in Wetumpka.

47. During her telephone call with Ms. Hall, Ms. Perryman described what

happened, about the Night Manager refusing to allow Ms. Perryman (and her family) to secure a hotel room at the Wetumpka Hampton by Hilton.

48. During her telephone call with Ms. Hall, Ms. Perryman described how the Night Manager refused to allow her, then her husband, to use the lobby restrooms. Ms. Perryman even told Ms. Hall that she, Ms. Perryman, had been in a tight to use the restroom, but that the Night Manager had refused even that.

49. Ms. Hall admitted that as far as she knew the restrooms were working.

50. During her telephone call with Ms. Hall, Ms. Perryman told Ms. Hall she, Ms. Perryman, picked-up on the Night Manager's "very racist vibe," and that she could tell that the Night Manager was "stereotyping" her, or words to that effect. Ms. Perryman tried to explain to Ms. Hall how demoralizing the incident was to both her and her family.

51. During the phone call, Ms. Hall did not deny racism to Ms. Perryman or express any shock at one of her night managers being racist.

52. Ms. Hall conceded that, owing to being white, she could not "understand" what Ms. Perryman and her family had been through, but that she sympathized with the Perrymans being turned away from an Alabama hotel, and restrooms, owing to the color of their skin.

53. Ms. Hall took down Ms. Perryman's phone number and said she would "investigate" the matter and get back with Ms. Perryman.

54.   Within one or two days of their initial telephone conversation, Ms. Hall telephoned Ms. Perryman in Birmingham, a continuation of October 11 incident.

55. During this follow-up telephone conversation, Ms. Hall admitted that there had been rooms available when the Perrymans had tried to secure one at the Hampton by Hilton on October 11, 2021; she likewise conceded through silence that no lobby area restroom had been out of order when the Perrymans were at the Hampton by Hilton.

56. In her follow-up call with Ms. Perryman, Ms. Hall did not deny racism was the cause, or a motivating factor, in the Perrymans being refused a room at the Wetumpka Hampton by Hilton on October 11, 2021; Ms. Hall offered the Perrymans a stay at the Wetumpka Hampton by Hilton for their "inconvenience."

57. The Night Manager offered no explanation for refusing to allow the Perrymans – Defendant Hampton by Hilton invitees – to secure a room on October 11, 2021, only that she had no rooms available "for *you*."

58. There were, in fact, rooms available at the Wetumpka Hampton by Hilton on October 11, 2021.

59. The Night Manager lied to Ms. Perryman – a Defendant Hampton by Hilton invitee – when she said the lobby restroom  was out of order; it was not.

60. With no other reasonable, let alone plausible, reasons left, the Night Manager's refusing to allow Plaintiffs – Defendant Hampton by Hilton invitees – to book a room at the Wetumpka Hampton by Hilton or even use the lobby restrooms, was because of the

Perrymans' race, Black.

61. Given the facts as described, reasonable and objective persons could conclude that but for the Perrymans' race, Black, the Wetumpka Hampton by Hilton – by and through its employee, agent and representative – would not have refused to allow Ms. Perryman, an invitee, to enter into a contract with Hampton by Hilton to book a hotel room on October 11, 2021.

62. Given the facts as described, reasonable and objective persons could conclude that the Perrymans' race, Black, was at least a motivating factor in the Wetumpka Hampton by Hilton – by and through its employee, agent and representative –  refusing to allow Ms. Perryman, an invitee, to book a hotel room on October 11, 2021.

63. Given the facts as described, reasonable and objective persons could conclude that the Perrymans' race, Black, was at least a motivating factor in the Wetumpka Hampton by Hilton refusing to allow either of the Perrymans, who were invitees, to use the hotel restroom on October 11, 2021, and/or that but for the Perrymans' race, Black, Defendant Hampton by Hilton would not have refused their and their family's use of the facilities.

64. Defendants interfered with the Perrymans' ability to contract for a room at the Wetumpka Hampton by Hilton and interfered with their enjoyment of guest facilities made available to all other hotel guests and invitees, because of their race, Black.

65. Defendants denied the Perrymans the use and enjoyment of the same

accommodations, privileges, and benefits that it grants to other similarly situated would-be hotel guests and invitees who are not Black.

66. As a result of the Defendants' unlawful actions described above, Plaintiffs suffered, continue to suffer, and will in the future suffer irreparable loss and injury, including but not limited to humiliation, embarrassment, emotional distress and trauma, feelings of racial stigmatization, an increased sense of vulnerability, and unlawful deprivation of their federally protected rights to exercise and enjoy equal treatment in the making and enforcing of contracts in places of public accommodation and having full access to and enjoyment of places of public accommodation without regard for race and/or color.

67. As of October 2021 an Alabama hotel's refusing to allow a Black family to book a room because of the color of their skin is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. But this is exactly what Defendants did to the Perrymans.

68. As of October 2021 an Alabama hotel's refusing to allow a Black family (who are trying to book a room for the evening) the use of the lobby restrooms because of the color of their skin is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. But this is exactly what Defendants did to the Perrymans.

69. Defenants' above-described outrageous acts and omissions proximately caused the Perrymans to suffer, and they will continue to suffer, irreparable loss and injury, including but not limited to humiliation, embarrassment, emotional distress, feelings of racial stigmatization, an increased sense of vulnerability in Alabama, whose state motto remains "The Heart of Dixie."

**Defendant Hilton's Recent Track Record**

70. The above-described incident is not an isolated one and Defendant Hilton has been on notice that such racism is an issue and problem at its and its franchisees' respective properties.

71. Defendant Hilton has a recent history of similar incidents involving Black guests and invitees at Hilton and Hilton franchise hotels throughout the United States.

72. In recent years Hilton employees, agents and apparent agents have actually used security guards and local police to challenge and remove Black guests and/or invitees from Hilton and Hilton franchise properties. Similarly situated white guests and invitees on Hilton and Hilton franchise properties were not treated in a similar manner.

73. Defendant Hilton owns and operates nationwide hotel franchises that offer public accommodations, including hotel lodging, to paying consumers.

74. A series of recent incidents demonstrate that Defendant Hilton is maintaining an federal law-violative policy, custom or practice of profiling Black guests and/or invitees present in the lobbies of Defendant Hilton's various hotel franchises. Security

agents of Defendant Hilton's hotels have accosted Black guests on several occasions and either demanded such guests leave, or demanded that these Black guests / invitees show proof of their status as a hotel guest.

75. On December 22, 2018, a Black man named Jermaine Massey ("Mr. Massey") was a guest at the DoubleTree Portland. The DoubleTree Portland is a hotel in Oregon owned and operated by Defendant Hilton. Mr. Massey was seated in the public lobby and speaking on his cell phone to his mother.

76. While Mr. Massey was speaking to his mother, a security guard employed by Defendant Hilton confronted Mr. Massey and demanded he provide his room key. The security guard then threatened Mr. Massey, telling him he, the security guard, would call the police because Mr. Massey was "loitering." Other white guests were present in the lobby but were not similarly confronted by the security guard.

77. The security guard then contacted the hotel manager, who in turn called the police. The security guard and hotel manager demanded that the police remove Mr. Massey from the premises, notwithstanding that Mr. Massey was lawfully on the premises as a paying guest.

78. The police arrived and escorted Mr. Massey off the premises, which resulted in mental anguish, humiliation, and embarrassment to Mr. Massey.

79. While not knowing of Mr. Massey's traumatic experience, the Perrymans nevertheless made sure not to press the issue of room, or lobby area restroom,

availability with the Night Manager: As Black residents of Alabama, they were all too well aware that if they pressed the issue the odds were good that the Night Manager would call the police on them – which no Black family wants in the middle of Alabama in the early morning hours. Both a desire not to escalate and fear of the implications of pressing their rights resolved them to just get in their car and get away from the Wetumpka Hampton by Hilton, demoralized, defeated, and physically suffering owing to their need of restroom facilities.

80. On October 27, 2018, Mr. Richard Wilcock, a Black man, named checked into the Hampton Inn and Suites Nashville-Vanderbilt-Elliston Place as a paying guest. That hotel is owned and operated by Defendant Hilton.

81. Mr. Wilcock, accompanied by his son, retrieved menus from the hotel's front desk. Mr. Wilcock then ordered food and waited in the lobby for the food to arrive.

82. As Mr. Wilcock was sitting in the lobby, a hotel manager asked Mr. Wilcock if he was a guest. Mr. Wilcock answered that he was.

83. The hotel manager then demanded that Mr. Wilcock state his name and room number.

84. As there were white guests also present in the lobby, Mr. Wilcock asked the hotel manager why he was being singled out. The manager responded by leaving and returning with a security guard.

85. The security guard, who was an African-American male, advised Mr. Wilcock

to "just go along with it" because the hotel manager "does this sometimes." The manager then told Mr. Wilcock and the security guard that she wanted Mr. Wilcock removed from the hotel.

86. A hotel employee or actual or apparent agent then called the police on Mr. Wilcock.

87. On March 4, 2018, Mr. Albert Law, who is Black, checked in to the Hilton Richmond Downtown using a reservation Mr. Law had made as a Hilton Honors member.

88. After checking in to the hotel, Mr. Law went to the lobby to wait for a colleague.

89. As he waited in the Hilton lobby, a security employee approached Mr. Law, and, acting as an agent or employee of Hilton, several times asked Mr. Law whether he "belonged there [or here]."

90. The security employee repeatedly demanded that Mr. Law produce his identification and room key to prove that he "belonged" at the hotel.

91. Hilton's other employees, agents, or apparent agents did not ask any other persons in the Hilton lobby – white persons, presumably guests or invitees – to provide identification or their room keys.

92. The only difference between Mr. Law and the other guests and other invitees was the color of his skin.

93. Upon information and belief, similar incidents involving Defendant Hilton and its franchisees and affiliates have occurred elsewhere across the United States. The aforementioned incident involving the Perrymans being refused a room and use of the lobby facilities, and – in two (2) telephone calls with Ms. Perryman in Birmingham – the General Manager not denying racism as being at the root of it all, evinces a continuing pattern a practice of Defendant Hilton failing or refusing to develop and/or disseminate policies and guidelines for its and its franchisees' hotels, and/or maintain a modicum of supervision over its and its franchisees' owners and managers in order to prevent such seeming widespread racism at Hilton and Hilton franchise hotels.

94. Defendant Hilton provides its hotel franchisees with various operations "Standards," which to an exacting degree it requires its franchisees to adhere and comply; yet – up to a point – it allows its franchisees to determine their own respective personnel policies or procedures. Still, Hilton also maintains the right and option to make personnel policies (including those regarding general rules, expected behaviors, guest relations and services standards, employee training, and the like) "available" to its franchisees.

95. In its relations and various contractual requirements with its franchisees, Hilton requires various branding, software (proprietary computerized business system), design, architecture, and the like, compliance; Hilton dictates these rules, requirements and standards to its franchises to an exacting degree, while simultaneously maintaining

loose, optional, or no "standards" regarding its franchisees' management and staff and their compliance with Title II and other racism-prohibiting Civil Rights statutes and civilized society norms.

96. The facts set forth in Paragraphs 93-95 show Defendant Hilton intent on maximizing operational control over its franchisees, while intentionally, purposefully, turning its back on, and/or opting out of, setting standards for its franchisees complying with various Civil Rights laws, namely those prohibiting racism at Hilton-brand franchises – franchises from which Hilton annually derives hundreds of millions of dollars in profit.

97.  Notwithstanding the facts set forth in the foregoing Paragraph 93-96, Hilton reviews and approves or disapproves its respective franchisee's management.

98.  Hilton's aforementioned acts and omissions – in sum, turning a blind eye to racism within its and its franchisees' hotels – intertwined with those perpetrated by the Wetumpka Hampton by Hilton, proximately caused the violations of both federal law and Alabama tort law and, in turn, proximately caused Plaintiffs to suffer the damages described herein.

## AMENDMENTS TO ORIGINAL COMPLAINT

### PARTIES

99. Plaintiffs re-plead the original parties in this case, Plaintiffs Rosylan Perryman and Stephen Perryman, and Defendants Hampton by Hilton and Hilton, as set forth in

Paragraphs 3 - 9 above.

100. Plaintiffs add Hilton Franchise Holding, LLC (hereafter, Hilton Holding) as a Defendant in this action.

101. Hilton Holding is a subsidiary of Defendant Hilton Domestic Operating Company, LLC.

102. Hilton Holding is a Delaware corporation which, like its parent company, Hilton Domestic Operating Company, LLC., and *its* parent company, Hilton Worldwide Holding, maintains its principle place of business in Tyson's Corner, McLean, Virginia.

103. Since at least 2015, Hilton Holding has done business in Alabama and, specifically, maintains a contract (franchise agreement) and contractual relationship with Defendant Hampton by Hilton, which is an Alabama company.

104. Paragraph 10 (see Page 4, above) is hereby restated and modified:  Upon information and belief, the Defendant Hampton by Hilton is Defendant Hilton's subsidiary's  (that is, Hilton Holding's) franchise.

## ADDITIONAL FACTS

105. Through its subsidiary, Hilton Holding and Hilton Holding's ongoing contractual relationship with Defendant Hampton by Hilton, Hilton has an indirect, but tangible, connection and contractual relationship with Hampton by Hilton.

106. In July 2014 non-party Hampton Franchise Inns, LLC, entered into a contract (franchise agreement) with Defendant Hampton by Hilton regarding, involving,

concerning, a for-profit business in Alabama, that is, Hampton by Hilton's Wetumpka, Alabama, hotel.

107. On April 1, 2015 Defendant Hilton Holding became the successor in interest of the aforementioned contract between Hampton Franchise Inns, LLC, and Defendant Hampton by Hilton.

108. Whether directly or indirectly, both Hilton and Hilton Holding derive income from their business activities in Alabama, including from Defendant Hampton by Hilton.

109. As Hilton's subsidiary, Hilton Holding is subject to this parent company's directives, guidelines, policies, customs, practices as such concern its own operations and relationships with its various franchises, including Hampton by Hilton in Wetumpka, Alabama.

110. Officers and other decision makers of Hilton and Hilton Holding communicate with one another on a regular basis.

111. Besides their relationship as parent-subsidiary companies, besides their both being part of the larger Hilton Worldwide family, and beside both companies principal places of business being in the same building in Tyson's Corner, Virginia, an example of the unfettered communications and free-flow of information between Hilton and Hilton Holding is Hilton's easily obtained a copy of the contract / franchise agreement between Hilton Holding and Hampton by Hilton, which Hilton previously filed in this case.

112. While Hilton Holding became assignee of the contract originally between

Hampton Franchise Inns, LLC, and Hampton by Hilton on April 1, 2015, ground was not broken for this new Wetumpka, Alabama, hotel until on or about April 28, 2015.

113. Defendants Hilton and Hilton Holding were involved in the new hotel, Hampton by Hilton, before ground was even broken for its construction.

114. According to the franchise agreement between Hilton Holding and Hampton by Hilton, Hilton Holding has the right to communicate directly with any management company and managers employed by the hotel, that is, Hampton by Hilton.

115. According to the franchise agreement between Hilton Holding and Hampton by Hilton, Hilton Holding administers "quality assurance" for Hampton by Hilton's "System."

116. According to the contract / franchise agreement between Hilton Holding and Hampton by Hilton, Hilton Holding is authorized to conduct periodic inspections of Hampton by Hilton.

117. According to the franchise agreement between Hilton Holding and Hampton by Hilton, Hilton Holding is authorized to conduct guest satisfaction surveys and audits to ensure compliance with Hilton Holding's "standards."

118. Hilton Holding's "standards" for guest satisfaction are one and the same with its parent company's, Hilton's, "standards."

119. According to the franchise agreement between Hilton Holding and Hampton by Hilton, Hampton by Hilton is required to permit Hilton Holding to inspect its

Wetumpka, Alabama, hotel; and, additionally, Hilton Holding is not even required to give Hampton by Hilton prior notice of such inspections to determine whether the hotel is in compliance with Hilton Holding standards.

120. Hilton Holding's and Hampton by Hilton's contract / franchise agreement, requires Hampton by Hilton to cooperate with Hilton Holding representatives during any such inspections and, furthermore, Hampton by Hilton is required by contract to take all steps necessary to correct any hotel deficiencies within the times Hilton Holding establish.

121. Whenever Hilton Holding dispatches a Quality Assurance Auditor to Hampton by Hilton to conduct either regular inspections or special on-site quality assurance re-evaluations, the contract / franchise agreement requires Hampton by Hilton to provide complimentary accommodations for such Quality Assurance Auditor.

### *Defendant Hilton's Non-Denials*

122. In original Complaint Paragraphs 70-98 (which are the same as the foregoing Paragraphs 70-98 of this Amended Complaint), Plaintiffs note Hilton's recent track record of racist incidents at its hotels and franchises around the United States, and provide specific examples of several, if not all, of those racist incidents.

123. In original Complaint Para. 70 (which is the same as the foregoing Para. 70 in this Amended Complaint), Plaintiffs allege, *inter alia*, that racism is an issue and problem at [Hilton's] and its franchisees' respective properties.

124. In Defendant Hilton's 21-paragraph, affidavit [Doc. 14-1, EX. A, pp. 2-4], filed in this action following service of the original Complaint in this action, Hilton does not deny it has been on notice that racism is an issue and problem at its and its franchisees' respective properties, nor does it deny it has a recent history of similar incidents [to that involving Plaintiffs] involving Black guests and invitees at Hilton and Hilton franchise hotels throughout the United States.

125. In Defendant Hilton's 21-paragraph, affidavit [Doc. 14-1, EX. A, pp. 2-4], filed in this action following service of the original Complaint in this action, Hilton does not deny a series of recent incidents demonstrate that Defendant Hilton is maintaining an federal law-violative policy, custom or practice of profiling Black guests and/or invitees present in the lobbies of Defendant Hilton's various hotel franchises, which is part of the allegation made in Para. 74 of the original Complaint (also set out in full in Para. 74 of this Amended Complaint).

126. Hilton, with actual knowledge of its track record of serious allegations regarding, and lawsuits arising out of, race discrimination within its U.S. franchises, has had the authority, but has failed or refused, to direct, require, or otherwise call for its subsidiary, Hilton Holding, to effectively address racism perpetrated by its / their franchisees, including at Hampton by Hilton in Wetumpka, Alabama.

127. Hilton, with actual knowledge of its track record of serious allegations regarding, and lawsuits arising out of, race discrimination within its U.S. franchises, has

had the authority, but has failed or refused, to direct, require, or otherwise call for its subsidiary, Hilton Holding, to effectively address (and extinguish, or at least mitigate) racism perpetrated by its  / their franchisees, including at Hampton by Hilton in Wetumpka, Alabama, which – in concert with Hampton by Hilton's failure or refusal to train and supervise its Night Manager – proximately caused Plaintiffs to suffer the racism, and / or other the unlawful conduct, described in this Complaint, as amended, and all damages further described herein.

128. Even with its parent company, Hilton, failing or refusing to direct, require or otherwise call for Hilton Holding to effectively address (and extinguish, or at least mitigate) racism perpetrated in its franchises, Hilton Holding could have, but chose not to, address the custom, practice, and/or culture of racism, and/or lack of training and supervision within its franchises. This inexorably lead to the above-described racist and  / or other unlawful acts perpetrated against Plaintiffs at the Hampton by Hilton on or about October 11, 2021.

129. Even with actual knowledge of recent racist incidents occurring in various Hilton brand properties in the United States, the "Standards" and compliance regime referred to in the franchise agreement between Hilton Holding and Hampton by Hilton have been and remain inadequate to address racism within Hilton's and Hilton Holding's, and/or their franchisees', hotels. This lead inexorably to the above-described racist and / or other unlawful acts perpetrated against Plaintiffs at the Hampton by Hilton on or

about October 11, 2021.

130.   Both Hilton and its subsidiary, Hilton Holding, have and have had the authority to update its franchise agreements (and/or "Standards") to adequately and effectively address the issue of hotel employee racism on Hilton brand properties, but, even with actual knowledge of such unlawful race-related issues and allegations occurring Hilton brand properties in recent years, neither of these Defendants took steps to update such franchise agreements. This lead inexorably to the above-described racist and / or other unlawful acts perpetrated against Plaintiffs at the Hampton by Hilton on or about October 11, 2021.

***Additional Re:  Hilton and Hilton Holding in Alabama***

131. Hilton Holding does business in Alabama, specifically with the Hampton by Hilton in Wetumpka, Alabama, through its ongoing contract / franchise agreement with Hampton by Hilton.

132. Hilton does business in Alabama, specifically with the Hampton by Hilton in Wetumpka, Alabama, by and through its subsidiary, Hilton Holding and the latter's ongoing contract / franchise agreement with Hampton by Hilton.

133.   Since at least April 1, 2015, Hilton and/or Hilton Holding has / have exercise(d) control over Hampton by Hilton's management by and through the aforementioned contract / franchise agreement, which specifically authorizes the franchisor (and, logically, the franchisor's parent company) to inspect, audit and require

27

Hampton by Hilton to take necessary steps to comply with Hilton and / or Hilton Holding "standards" for its franchisees' operations.

134. If either or neither Hilton or Hilton Holding chose not to exercise its / their authority to update its contract / franchise agreement with Hampton by Hilton to address the problem of systemic racism at Hilton brand properties, then, *[a]* but for such Defendants' failure or neglect, Plaintiffs would not have suffered the racism and / or other unlawful acts at the Hampton by Hilton on or about October 11, 2021;  or, *[b]* such failure or neglect was a contributing and/or motivating factor in the racism and / or other unlawful acts which Plaintiffs suffered on or about October 11, 2021.

135. If either or neither Hilton or Hilton Holding chose not to exercise its / their authority to inspect and /or communicate directly with any management company and managers employed by Hampton by Hilton regarding preventing racism and racist acts by Hampton by Hilton employees, then, *[a]* but for such Defendants' failure or neglect, Plaintiffs would not have suffered the racism and / or other unlawful acts at the Hampton by Hilton on or about October 11, 2021;   or, *[b]* such failure or neglect was a contributing and/or motivating factor in the racism and / or other unlawful acts which Plaintiffs suffered on or about October 11, 2021.

136. Hilton Holding franchise agreement requires Hampton by Hilton to comply with certain "standards."

137. Both Hilton Holding and / or its parent company, Hilton, developed the

"standards" by and under which Hampton by Hilton must operate its hotel.

138. Both Hilton Holding and / or its parent company, Hilton, have the authority, have control, over determining what Hampton by Hilton's operational standards were during October 2021.

139. Hilton Holding' and / or its parent company, Hilton, failed to develop and / or enforce franchise agreement "standards" that would have prevented the racism and / or other unlawful acts at the Hampton by Hilton, which Plaintiffs suffered on or about October 11, 2021.

### Additional Re:  Plaintiffs' knowledge of Hilton

140. During the early hours of October 11, 2021, while she and her family were on their way from Atlanta to Wetumpka, Plaintiff Roslyn Perryman used her phone to google then called the reservations line for Hampton by Hilton. She just wanted to check on room availability.

141.  The person who answered the reservations line said to Ms. Perryman, "Thank you for calling Hampton by Hilton."

142. When, in or around the early hours of October 11, 2021, Plaintiffs and their children neared the Wetumpka, Alabama, Hampton by Hilton, they saw the blue sign out front which read:  "Hampton by Hilton."

143. Plaintiffs understood they were staying at a Hilton property.

*Updates to the original Complaint*

144. The following update original Complaint Paragraphs 1-98, which are the same as Paras. 1-98 above:

145. Para. 16's reference to Hilton, also includes its subsidiary, Hilton Holding.

146. Para. 19: The word "both" should now read "all"  Defendants,  to  include Hilton Holding.

147. Para. 20's "policy, practice or custom" allegation should now include Hilton Holding.

148. Para. 21: The word "both" should now read "all" Defendants, to include Hilton Holding.

149. Para. 73's allegation regaring Hilton's franchise ownership, should now be expanded, to wit: the following should be added: "This ownership includes both the plain meaning of 'own' or 'possess,' as well as Hilton, either directly or through subsidiary companies, being a party, or parent company to parties, to franchise agreements and other contracts by which it earns revenues from hotels."

150. Para. 74's allegation regarding Hilton's various hotel franchises should now include its subsidiary's/ies' hotel franchises, including Hilton Holding.

151. Para. 94: Between the words "Hilton" and "provides" insert the words "and / or its subsidiary and affiliated companies..."

152. Paras 95-98's allegations regarding Hilton now also apply to Hilton Holding.

153. Now include Hilton Holding to Counts I-III re: "Defendants" and Hilton.

## COUNT I

## Title II of the Civil Rights Act – 42 U.S.C. § 2000a

154.  By this reference Plaintiffs incorporate the foregoing allegations of this Complaint as if fully set forth herein.

155. Plaintiffs are Black and therefore entitled to the Equal Access protections guaranteed by and under 42 U.S.C. § 2000a(a).

156. At all relevant times hereto, Defendants were an "inn, hotel, motel, or other establishment which provides lodging to transient guests" within the meaning of 42 U.S.C. § 2000a(b)(1). Defendants operations affect interstate commerce.

157. At all times relevant hereto, Plaintiffs were transient guests within the meaning of 42 U.S.C. § 2000a(b)(1).

158. Plaintiffs attempted to booked and secure lodging with Defendant Hampton by Hilton on October 11, 2021.

159. By using the lobby and engaging the Night Manager in both an attempt to secure lodging for the night (and at least one night thereafter) and asking to use the lobby facilities as invitees / transient guests, Plaintiffs attempted to exercise the right to full benefits and enjoyment of a place of public accommodation (that is, lodging, and the lobby's facilities).

160. Plaintiffs were treated less favorably than similarly situated persons who were not members of the protected class. Plaintiffs and their children were refused

lodging and use of the lobby facilities. The only difference between Plaintiffs and those allowed to secure rooms and use the lobby was the color of Plaintiffs' skin.

161. Defendants denied Plaintiffs the benefits and enjoyment of the place of accommodation (that is, lodging and the hotel lobby's facilities). Defendants denied Plaintiffs the right to peacefully use and enjoy the Hampton by Hilton's hotel rooms and common areas of the hotel.

162. At all times relevant hereto the Night Manager was an agent and employee of Defendant Hampton by Hilton and acted within the course and scope of her employment with Defendant Hampton by Hilton.

163. At all times relevant hereto, Defendant Hilton maintained a policy, custom or practice of allowing its franchise owners and operators to profile Black invitees of its various hotel franchises; and/or it maintained a policy, custom or practice of failing or refusing to develop and disseminate to its franchisee owners and operators standards, policies, guidelines, hiring and training manuals, and the like, that would prevent profiling, stereotyping and other race discrimination at its franchises.

164. Thus Defendants Hilton and/or Hampton by Hilton are directly liable for the unlawful acts and omissions perpetrated by Hampton by Hilton's Night Manager, who refused to allow Plaintiffs use and enjoyment of the Wetumpka, Alabama, Hampton by Hilton.

165. To the extent either Defendant is not directly liable for the unlawful and

tortious acts and omissions of the Night Manager, they are vicariously liable under a theory of *respondeat superior.*

166. Defendants' individual unlawful policies, customs and/or practices described herein was the moving force behind privations Plaintiffs suffered.

167. Defendants, jointly and severally, denied Plaintiffs the full use and equal enjoyment of the services of a place of public accommodation on the basis of their race, in violation of Title II of the Civil Rights Act of 1964 (42 U.S.C. § 2000a).

168. Defendants' joint and several unlawful acts proximately caused Plaintiffs each to suffer future suffer irreparable loss and injury, including but not limited to humiliation, embarrassment, emotional distress and trauma, feelings of racial stigmatization, an increased sense of vulnerability, and unlawful deprivation of their federally protected rights to exercise and enjoy equal treatment in places of public accommodation and having full access to and enjoyment of places of public accommodation without regard to their race and/or color.

## COUNT II

### To Make and Enforce Contracts – 42 U.S.C. § 1981

169. By this reference Plaintiffs incorporate the foregoing allegations of this Complaint as if fully set forth herein.

170. Plaintiffs are Black and are therefore members of a protected class under 42 U.S.C. § 1981.

171. Plaintiff Roslyn Perryman sought to secure lodging, a room for her family,  at Defendant Hampton by Hilton for October 11, 2021, then October 12, checking out on October 13, 2021. Plaintiff sought and attempted to enter into a contract with Defendant Hampton by Hilton whereby in consideration of the contract price paid, this Defendant would provide Plaintiffs and their children with public accommodations, including to peacefully use and enjoy the common areas of the hotel.

172. Hampton by Hilton had rooms available on October 11 and 12, 2021 and Plaintiffs met the hotel's standard requirements for occupancy. They were able and willing to pay the contract price for the lodging, and did nothing disruptive that would have warranted being denied lodging. Plaintiff Roslyn Perryman was polite and pleasant to the Night Manager when the Night Manager scowled at her, looked at her in a way that "gave off a racist vibe" and refused to allow Ms. Perryman to secure lodging for her family.

173. Rooms were available, as confirmed both by a Hampton reservations line Ms. Perryman called and by General Manager Samantha Hall in follow-up telephone conversations with Ms. Perryman in Birmingham.

174.  When Ms. Perryman mentioned race as the reason for her and her family's treatment on October 11, Ms. Hall never denied that that was the cause of the privations and discrimination the Perrymans suffered. In fact Ms. Hall told Ms. Perryman that she sympathized with Ms. Perryman having to go through what she did at the hands of the

34

Wetumpka Hampton by Hilton Night Manager.

175. By refusing to allow Plaintiffs to secure lodging for the night, and refusing to allow them, as invitees desiring to enter into a contract with the Wetupka hotel, to secure lodging or even use the lobby restrooms, Defendants, jointly and severally, denied Plaintiffs the right to peacefully use and enjoy the hotel and the hotel's common areas. But for their race, Black, Plaintiffs would not have been subjected to these privations and unlawful acts perpetrated by Defendants.

176. By discriminating against Plaintiffs on the basis of their race, Defendants have denied Plaintiffs the same right to enjoy the benefits, privileges, terms, and conditions of contract as is, and was, enjoyed by white citizens, in violation of Plaintiffs' rights under the Civil Rights Act of 1866, 42 U.S.C. § 1981.

177. To the extent that Defendants Hilton and/or the Hampton by Hilton Defendants are not directly liable for the unlawful and tortious acts and omissions of Defendant Hampton by Hilton's Night Manager, they are vicariously liable under a theory of *respondeat superior*.

178. Defendant Hilton's policy, custom or practice of allowing its franchise owners and operators to profile Black invitees of its various hotel franchises; and/or its policy, custom or practice of failing or refusing to develop and disseminate to its franchisee owners and operators standards, policies, guidelines, hiring and training manuals, and the like, that would prevent profiling, stereotyping and other race

discrimination at its franchises, was a, if not the, moving force behind the privations and damages Plaintiffs suffered.

179. As a direct and proximate result of Defendants' heretofore described unlawful and tortious conduct, Plaintiffs each suffered severe mental anguish and emotional harm.

## COUNT III
### Intentional Infliction of Emotional Distress

180. By this reference Plaintiffs incorporate the foregoing allegations of this Complaint as if fully set forth herein.

181. The Wetumpka Hampton by Hilton's white Night Manager refused to allow the Perrymans lodging for the night because of the color of their skin. When Ms. Perryman asserted this to General Manager Samantha Hall, Ms. Hall did not deny this.

182. The Night Manager was motivated by racism, racial animosity.

183. Depending on a person's age, the culture of "Whites Only" lodging and "White" and "Colored" restrooms remain part of the actual, or certainly cultural memory of Black Alabamians, even if some Caucasians seek to collectively ignore, forget, or dismiss the horrors of Jim Crow, or hold the laws enacted during the Civil Rights Era in contempt.

184. A callous Caucasian Night Manager denying a Black family lodging, or even the use of a hotel's facilities when they were invitees, is a traumatic thing for most any Black person, perhaps especially in Alabama. And this is exactly what happened to the

Perrymans on October 11, 2021, as confirmed – or at least did not deny – by Ms. Hall in her subsequent telephone conversations with Ms. Perryman over the course of the following 24-48 hours.

185. As Defendant Hampton by Hilton's agent, representative and employees, and acting within the course and scope of her authority, the Night Watchman perpetrated an act against the Perrymans so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

186.  Defendant Hilton's aforementioned acts and omissions regarding its policies, customs, practices, contributed to and/or were the moving force behind this outrage.

187. Defendant Hampton by Hilton failed to hire a non-racist Night Manager, and or failed or refused to train and supervise this manager in order to prevent its agent's / employee's acts perpetrated against the Perrymans on October 11, 2021, confirmed during the course of Ms. Perryman's and Ms. Hall's telephone conversations over the following 24-48 hours.

188. To the extent Defendants are not directly liable for the above-described tortious acts and omissions of the Night Manager, they are vicariously liable under a theory of *respondeat superior*.

189. By subjecting Plaintiffs and their children to the racism described  herein, Defendants perpetrated the tort of intentional infliction of emotional distress, also known

as outrage.

190. As a direct and proximate result of the tortious conduct set forth in this Count III, Plaintiffs each suffered severe mental anguish and emotional harm.

## COUNT IV

### Negligent and/or Wanton Hiring, and / or Failure to Train and Supervise

191. By this reference Plaintiffs incorporate the foregoing allegations of this Complaint as if fully set forth herein.

192. Defendant Hampton by Hilton had a duty to adequately and properly hire, train and supervise its employees, including its Night Manager, so as to prevent its employees from violating Plaintiffs' civil rights and / or committing tortious acts against Plaintiffs.

193. Defendants Hilton and Hilton Holding, by and through their company "standards" – referenced and / or memorialized within the aforementioned contract / franchise agreement – as well as their contractual right to directly contact Hampton by Hilton's managers, as well as to inspect and audit Hampton by Hilton's operations and direct this Hilton brand franchise to take necessary steps to comply with said standards, had a duty to adequately and properly train, supervise, provide guidance to and / or counsel Hampton by Hilton so as to prevent this hotel's employees from violating Plaintiffs civil rights and / or committing tortious acts against Plaintiffs.

194. Both Hilton and Hilton Holding were on actual notice of spate of racist

incidents – including racial profiling by Hilton and / or Hilton franchise staff – perpetrated at Hilton and / or Hilton franchise hotels over the past several years.

195. Hilton and Hilton Holding's standards are shoddy and / or this parent and its subsidiary ignored and / or otherwise failed or refused to adequately and properly address racism in its / their hotels and franchises through even baseline anti-racism training and supervision, now evidencing a custom or practice of racial profiling and racism within Hilton, Hilton Holding, and / or their various hotels and franchises.

196. On or around October 11, 2021, Plaintiffs were subjected to and suffered racism and / or other unlawful conduct at the Wetumpka, Alabama, Hampton by Hilton.

197. The racism and other unlawful acts suffered by Plaintiffs on or about October 11, 2021, at the Hampton by Hilton, was proximately caused by Defendants' individual and collective failure or refusal to adequately hire (or, in Hilton's and Hilton Holding's case, set adequate hiring standards with its franchisee's management), train and supervise Hampton by Hilton staff, namely, but not necessarily limited to, the Night Manager and those who trained and supervised her.

198. Defendants' individual and collective failure to hire, train and supervise Hampton by Hilton staff, including but not necessarily limited to the Night Manager, evidences negligence, reckless disregard, and / or wantonness which proximately caused the racism and / or other unlawful acts perpetrated on Plaintiffs on or about October 11, 2021, along with the damages they suffered.

199. As a proximate cause of Defendants individual and intertwined negligence, reckless disregard and / or wantonness, Plaintiffs suffered irreparable loss and injury, including but not limited to humiliation, embarrassment, emotional distress and trauma, feelings of racial stigmatization, an increased sense of vulnerability, and unlawful deprivation of their federally protected rights to exercise and enjoy equal treatment in places of public accommodation and having full access to and enjoyment of places of public accommodation without regard to their race and/or color.

## REQUEST FOR RELIEF

WHEREFORE, THE PREMISES CONSIDERED, Plaintiffs respectfully request trial by struck jury and that the Court grant the following relief:

A. Enter a declaratory judgment finding that the foregoing actions of the all Defendants violate the Civil Rights Act of 1866, 42 U.S.C. § 1981, and 42 U.S.C. § 2000(a);

B. Enter injunctive relief forbidding all Defendants and / or Defendants' subsidiaries and franchises, as the case may be, from refusing lodging to persons based on race;

C. Enter injunctive relief requiring all Defendants develop policies, procedures, training, oversight, guidelines, protocols, hiring and training practices that will prevent or at least mitigate the chances of such Title II-violative acts going forward in these

Defendants' respective and intertwined businesses;

D. Award compensatory damages to each Plaintiff and against Defendants, jointly and severally, in a amounts to be determined by a jury that would fully compensate Plaintiffs' humiliation, embarrassment and emotional distress caused by Defendants' unlawful and tortious conduct as set forth in Counts II, III, and IV.

E. Also regarding Counts II, III and IV, award punitive damages to each Plaintiff and against Defendants, jointly and severally, in amounts to be determined by the jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future.

F. Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000(a) and 42 U.S.C. § 1981.

G. Award any other relief in law or equity as the Court deems just.

Respectfully filed and served on this, the 30th day of March, 2022.

> _s/ Richard R. Newton_
> Richard R. Newton,
>   Attorney at Law, P.C.
> Counsel for Plaintiffs
> 2100 Southbridge Pkwy, Suite 650
> Birmingham, AL  35209
> Tel:  (205) 356-2498
> richardrussellnewton@gmail.com
> ASB-0776-w85r

<u>CERTIFICATE OF SERVICE</u>

This is certifies that on this, the 30th day of March, 2022, I served the foregoing First Amended Complaint on Defendants by sending same by email to their attorneys of record and/or via the United States District Court's CM/ECF document filing system:

Dennis Bailey, Esq.      Email: *DRB@rushtonstakely.com*
Benjamin Wilson, Esq.    Email: *BCW@rushtonstakely.com*
Rushton, Stakely, Johnston & Garrett, P.A.
For Defendants Hilton Domestic Operating Company, Inc.,
  and Hilton Franchise Holding, LLC.
184 Commerce Street
Montgomery, Alabama  36104

Peter Bolvig, Esq.  Email: *PBolvig@hallboothsmith.com*
Hall Booth Smith, P.C.
For Defendant Hotel Wetumpka AL, LLC
2001 Park Place  Suite 870
Birmingham, AL 35203

s/ *Richard R. Newton*,
Attorney for Plaintiffs


Additionally, to save the cost of service of a summons, I have today, March 30th, 2022, provided counsel for Hilton Franchise Holding, LLC, with a Waiver of Service of Summons form and have invited counsel to complete same and return to me so that I may file the Waiver of Service of Summons with the Court. I have done so by sending two (2) copies of the Waiver of Service of Summons and one (1) copy of the Amended Complaint to said counsel via said counsel's respective email/s of record.

s/ *Richard R. Newton*,
Attorney for Plaintiffs